[No. 49810-0-I. Division One. July 12, 2004.]

THE STATE OF WASHINGTON, *Respondent*, v. LONNIE E. LILLARD, *Appellant*.

*Lonnie E. Lillard* pro se.
*Gregory C. Link* and *Nancy P. Collins* (of *Washington Appellate Project*), for appellant.
*Norm Maleng, Prosecuting Attorney*, and *Jimmy I. Hung* and *Deric Martin, Deputies*, for respondent.

BAKER, J. — Lonnie Lillard appeals his conviction for possessing stolen property. We hold that Lillard validly waived his right to counsel. We also reject his claim that the trial court abused its discretion in admitting evidence of uncharged crimes. And although the trial court did not calculate Lillard's exact offender score, the court properly concluded that his score exceeded the statutory maximum. Lillard also raises a number of pro se issues. Because these claims are without merit, we affirm his conviction and sentence.

I

In October 2000, Nordstrom's loss prevention unit began investigating incidents of fraud involving altered electronic gift cards. The perpetrators would apparently purchase low-value gift cards and alter the magnetic strips on the backs of the cards to correspond with the number from an account with substantially more money. For example, they would purchase a $10 card and then alter the number on the back strip to match an account with an $800 balance. The individuals would then purchase items using the cards and later return the items for cash. Incidents involving these altered cards were reported at five stores in the Seattle area.

Loss prevention personnel handling the investigation instructed store employees to check gift card numbers carefully to ensure the number on the card matched the number on the magnetic strip. Store security personnel

were warned to be on the lookout for persons purchasing expensive clothing without regard to size or style and using gift cards to pay for the merchandise. A group of suspects who were using the altered cards were identified, and security personnel began observing them through closed circuit video surveillance systems. One of the persons Nordstrom investigators identified was Lillard.

On November 5, Nordstrom security at the Bellevue store observed potential suspects engaging in the described activities. A man entered the store and began grabbing expensive sweaters without apparent regard to color, size, or style. Store security observed the suspect make several calls on his cell phone during the time he was selecting the sweaters. He then paid for the sweaters with several gift cards. The numbers on the front of the cards did not match the strips. The store security manager allowed the clerk to complete the transaction.

Michele Rufer, the store's loss prevention manager, then contacted Bellevue police to report the crime. Officer Jessamyn Poling responded to take a report. Rufer explained that the suspects had been recorded on the store's video surveillance equipment buying, returning, and loading merchandise into a U-haul truck with sunflowers painted on the side.

The next day while on patrol, Officer Poling observed a truck matching this description driving toward the mall. Poling followed and watched as the truck turned toward Nordstrom and then parked in an adjacent grocery store lot.

Officer Poling watched as Lillard emerged from the driver's seat, went to the rear of the vehicle, and unlocked the cargo door. Shopping bags with the Nordstrom logo on them were visible inside the truck. Lillard then went across the street toward the Nordstrom store, accompanied by two female passengers.

Officer Poling called Nordstrom and spoke with Rufer, who identified the U-Haul as the same one the thieves had

used before. Poling went inside the store into the security office where Rufer and her team were monitoring the suspects using security cameras. Rufer identified all three suspects as participants in the gift card fraud. As Rufer and Poling watched, Lillard and the two females split up. The two women went inside and returned items from another store purchased with altered gift cards. Lillard appeared to be overseeing the women's activities. After completing the returns, Lillard and the two women returned to the truck. Officer Poling pursued them, stopped the truck, and arrested Lillard for driving with a suspended license.

In the passenger compartment, the officer noticed a Nordstrom bag filled with numerous expensive sweaters. These were the same sweaters purchased on November 5 with altered gift cards. Lillard was charged with first degree possession of stolen property. At trial Lillard represented himself pro se. He was found guilty following a jury trial. He timely appeals his conviction.

## II

■ Lillard first argues that he did not knowingly and intelligently waive his right to assistance of counsel. Both the state and federal constitutions afford a criminal defendant the right to reject assistance of counsel and to represent himself.[1] But a defendant desiring to represent himself must knowingly and intelligently waive his right to counsel.[2]

■ While there is no formula for determining whether a waiver is valid, the preferred method of ensuring a valid waiver is a court's colloquy with the defendant conducted on the record.[3] This colloquy should include discussion about the seriousness of the charge, the possible maximum penalty involved, and the existence of technical procedural

---

[1] *Faretta v. California*, 422 U.S. 806, 821, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); *State v. Imus*, 37 Wn. App. 170, 173, 679 P.2d 376 (1984).

[2] *State v. DeWeese*, 117 Wn.2d 369, 377, 816 P.2d 1 (1991).

[3] *State v. Silva*, 108 Wn. App. 536, 539, 31 P.3d 729 (2001).

rules governing the presentation of the accused's defense.[4] In the absence of a colloquy, the record must reflect the defendant's knowledge and appreciation of these factors and other risks associated with self-representation.[5] While a defendant's education, literacy, and experience in prior trials are relevant, these factors are not dispositive of whether he understood the relative advantages and disadvantages of self-representation in a particular situation.[6]

In *State v. Silva,*[7] we reversed a conviction because the trial court did not conduct a proper colloquy before granting the defendant's motion to proceed pro se. In *Silva,* the defendant asked to represent himself at sentencing. The court granted the motion. Later, Silva asked the same judge to allow him to represent himself pro se in a second criminal case. The court granted his motion without conducting a colloquy. We reversed Silva's second conviction because the colloquy from the first case was insufficient as applied to the challenged case.[8]

Before conducting its CrR 3.5 and 3.6 motions, the court engaged Lillard in a colloquy about proceeding pro se. The court first asked Lillard if he had represented himself before and if he understood that he had to follow the rules of evidence. After Lillard replied that he had represented himself, and that he knew he was subject to the rules of evidence, the court went on to caution Lillard about the perils of self-representation:

> THE COURT: Because it's a heavy burden to represent yourself, I want to make sure that you have an appreciation of what it is that is required. It's not advisable that attorneys represent themselves. While they may have the legal knowledge, they are

[4] *City of Bellevue v. Acrey,* 103 Wn.2d 203, 211, 691 P.2d 957 (1984).

[5] *Acrey,* 103 Wn.2d at 211; *see also Faretta,* 422 U.S. at 835 (indicating that he made his decision with his " 'eyes open' ") (quoting *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S. Ct. 236, 87 L. Ed. 268 (1942)).

[6] *Acrey,* 103 Wn.2d at 211.

[7] 108 Wn. App. 536, 31 P.3d 729 (2001).

[8] *Silva,* 108 Wn. App. at 540-42.

not necessarily in their own case able to step back and say what is reasonable to a jury. It's very hard to do that when it's your case. . . . You have a right to represent yourself if you wish to. But, I am suggesting to you that it's not necessarily a good idea to do that. Now, you have done this before, Mr. Lillard?

MR. LILLARD: Yes.

The court continued cautioning Lillard about the intricacies of trial practice, including knowing when to object, present evidence, and cross-examine witnesses. The court explained that after completing the motions, "I may want to have a little more discussion with you before we get to the point of you actually representing yourself at trial." But the court also acknowledged that "it sounds to me like you have a pretty good understanding of what you are getting into."

After ruling on the pretrial motions, the court continued its colloquy with Lillard about self-representation. The court twice explained the maximum penalties for the alleged crime:

THE COURT: Okay. You understand that you are charged with Possession of Stolen Property, which is a Class C felony and carries a maximum penalty of—

MS. HECKLINGER: First degree.

THE COURT: I'm sorry. Class [B].[9] So that's a maximum of ten years. . . . $20,000 fine. You are aware of that, Mr. Lillard?

MR. LILLARD: Yes.

Later, during the same colloquy, the court repeated the maximum penalty that Lillard could face if convicted:

THE COURT: You know that with a Class B felony you are looking at a potential [of] as much as ten years and $20,000 fine as an outcome of the trial. Is this decision entirely voluntary on your part?

MR. LILLARD: Yes, it is.

THE COURT: Then I find that the defendant knowingly and voluntarily waives his right to counsel, and therefore I will

---

[9] The transcript says "Class D." This is an obvious typographical error.

permit you to represent yourself at trial. Ms. Hecklinger, you can be standby counsel.

■ On appeal, Lillard claims that the court failed to satisfy *Silva*'s requirement that the defendant be apprised of the nature of the charges he faces. He argues that he could not intelligently waive his right to counsel because the court did not explain the essential elements of the charged crime and possible defenses.

Lillard focuses on his exchange with the court at his arraignment several months earlier. There, Lillard stated that he had not looked at the charging document. But his attorney acknowledged receipt of the information, waived formal reading, and entered a plea of not guilty for Lillard. Later, at the same arraignment, Lillard again explained to the court that he had not received a copy of the affidavit of probable cause and that he did not know what he was pleading guilty or not guilty to.

But evidence before the trial court contradicts Lillard's assertion that he did not know the nature of the charges against him. Both he and his attorney discussed with the court his familiarity with the charges and that he was proceeding pro se because he had a different trial strategy than his attorney. While a colloquy detailing each issue is the preferred method, the judge's failure to do so is not fatal in this case. And while it is not necessarily a factor, Lillard ably represented himself at trial. The prosecutor acknowledged this at sentencing, stating that "I think he did an admirable job of [representing himself]."

Lillard next argues that the trial court abused its discretion by admitting evidence of uncharged criminal acts. The court allowed videotapes, testimony, and documentary evidence about a number of other thefts and incidents. Lillard argues that this evidence encouraged the jury to conclude that he had a propensity to steal. He also argues that the evidence had no factual relationship to the charged crime.

■■ Evidence of prior crimes, wrongs, or acts is inadmissible if it is offered to establish a person's character or to

show he acted in conformity with that character.[10] ER 404(b) provides that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show [that he acted] in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.[11]

But this evidence may be admitted if it is relevant to other issues "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."[12] Before admitting evidence of prior acts under this provision, the trial court must:

> (1) find by a preponderance of the evidence that the uncharged acts probably occurred before admitting the evidence, (2) identify the purpose for which the evidence will be admitted, (3) find the evidence materially relevant to that purpose, and (4) balance the probative value of the evidence against any unfair prejudicial effect the evidence may have upon the fact-finder.[13]

A trial court is required to conduct this balancing on the record,[14] and its determination is reviewed for abuse of discretion.[15]

■ A defendant cannot insulate himself by committing a string of connected offenses and then argue that the evidence of the other uncharged crimes is inadmissible because it shows the defendant's bad character, thus forcing the State to present a fragmented version of the events.[16]

---

[10] ER 404(b); *see State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995).

[11] ER 404(b).

[12] ER 404(b).

[13] *State v. Kilgore*, 147 Wn.2d 288, 292, 53 P.3d 974 (2002).

[14] *See State v. Jackson*, 102 Wn.2d 689, 694, 689 P.2d 76 (1984).

[15] *State v. Lane*, 125 Wn.2d 825, 831, 889 P.2d 929 (1995).

[16] *State v. Tharp*, 27 Wn. App. 198, 205, 616 P.2d 693 (1980), *aff'd*, 96 Wn.2d 591, 637 P.2d 961 (1981).

Under the res gestae or "same transaction" exception to ER 404(b), evidence of other crimes or bad acts is admissible to complete the story of a crime or to provide the immediate context for events close in both time and place to the charged crime.[17]

 Given the complex nature of this case, and the difficulty in setting the context of the alleged crime, the challenged evidence was property admitted. The prosecutor's explanation for offering the evidence, to rebut Lillard's argument that he did not know the items were stolen, was reasonable. Moreover, Lillard failed to ask for a limiting instruction. An abuse of discretion has not been shown.

Lillard next argues that the trial court erred by not calculating his exact offender score. At sentencing, the prosecutor submitted certified copies of five separate prior judgment and sentence orders. The State explained that these totaled 18 points, and that the State needed to prove only nine of the felonies shown on the prior judgments to establish the maximum offender score of nine. Lillard argued that many of the convictions involved the same criminal conduct and should be counted as one offense. After extensive discussion of Lillard's prior convictions, the trial court rejected his argument, explaining:

> You are correct that there are a couple of cases where the counts count together because they are the same victim, on the same time, at the same place, the same criminal intent. But, clearly, with seven different victims on the forgery convictions in Snohomish County, and at least three different victims out of the eight count forgeries in King County, and then the other convictions you have, we are going to be at nine or more. . . .

Lillard responded by asking whether the seven Snohomish convictions should count as one crime for sentencing purposes. The court explained that they were separate because each victim was different.

 Underlying Lillard's argument is the implicit assertion that the court must continue to calculate exactly how

---

[17] *State v. Fish*, 99 Wn. App. 86, 94, 992 P.2d 505 (1999).

many points a defendant has, even when it is clear that the number far exceeds nine. We disagree. The Sentencing Reform Act of 1981[18] requires that the court "specify the convictions it has found to exist."[19] Nowhere does the statute require the court to determine all possible convictions or continue calculating an offender's score that far exceeds nine. A trial court may determine that nine convictions exist and then stop calculating, so long as the court is not considering the imposition of an exceptional sentence based on reasons related to the offender score. We note that a court's failure to include a prior conviction in calculating an offender score has no bearing on future calculations.[20]

The trial court sentenced Lillard within the standard range. And Lillard cannot demonstrate any prejudice resulting from the court's failure to continue calculating his score when his score clearly far exceeded the statutory maximum of nine points. Where, as here, the court imposes a standard range sentence based on an offender score of nine, we will not remand to calculate the exact score absent a showing of prejudice.

*Lillard's additional pro se challenges*

Lillard also raises a number of pro se arguments in a supplemental brief. He first argues that by failing to specify which means of possession the jury was convicting him under, he was deprived of his right to a unanimous jury verdict.

Where a single offense may be committed in more than one way, the jury must be unanimous as to guilt for the crime charged, but unanimity is not required as to the specific means by which the crime was committed, so long

---

[18] Ch. 9.94A RCW.

[19] RCW 9.94A.500(1).

[20] *See* RCW 9.94A.525(18) ("The fact that a prior conviction was not included in an offender's offender score or criminal history at a previous sentencing shall have no bearing on whether it is included in the criminal history or offender score for the current offense.").

as substantial evidence supports each alternate means.[21] Substantial evidence exists if any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.[22]

A person is guilty of possessing stolen property if he knowingly possesses stolen property that exceeds $1,500 in value.[23] The statute defines possessing stolen property as "knowingly to receive, retain, possess, conceal, or dispose of stolen property knowing that it has been stolen and to withhold or appropriate the same to the use of any person other than the true owner or person entitled thereto."[24]

The court instructed the jury consistent with these statutory provisions and provided the jury with a definition of "receive," that explained, "Receive includes but is not limited to 'acquiring title, possession, control, or a security interest, or any other interest in the property.' "

The "to convict" instruction required the State to prove beyond a reasonable doubt that Lillard "knowingly received, retained, possessed, concealed, or disposed of stolen property."[25] Because the instruction specifically listed the

---

[21] *State v. Kitchen*, 110 Wn.2d 403, 410, 756 P.2d 105 (1988).

[22] *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

[23] RCW 9A.56.150.

[24] RCW 9A.56.140(1).

[25] Instruction 6 provided:

To convict the defendant of the crime of possessing stolen property in the first degree, each of the following elements of the crime must be proved beyond a reasonable doubt: (1) That on or about the 9th day of November, 2000, the defendant knowingly received, retained, possessed, concealed, or disposed of stolen property; (2) That the defendant acted with knowledge that the property had been stolen; (3) That the defendant withheld or appropriated the property to the use of someone other than the true owner or person entitled thereto; (4) That the value of the stolen property exceeded $1500; and (5) That the acts occurred in the State of Washington.

It should be noted that 11 *Washington Pattern Jury Instructions: Criminal* (2d ed. 1994) (WPIC) on possession of stolen property, specifically WPIC 77.02, 77.06 and 77.11, lists in brackets all the definitional terms for possessing stolen property in the "to convict" instruction. Although the comment indicates that bracketed material is to be used as applicable, the suggestion frequently is not heeded. It is better practice to instruct only as to the alternative means actually at issue.

alternative definitions of "possession" as alternative means of the offense to be proved by the State, there must be sufficient evidence to support each alternative, unless we can determine that the verdict was based on only one alternative means and that substantial evidence supports that means.[26] We conclude that substantial evidence supports each alternate means.

Under the definition provided to the jurors, receiving stolen property includes possessing that property. Therefore, Lillard could not possess the stolen property without receiving it. Evidence at trial clearly established that Lillard possessed the property. And although the court did not provide a definition for "retain," a juror could not reasonably conclude that Lillard retained the property without possessing or receiving it.

Substantial evidence admitted at trial also supports the "concealed" means. Officer Poling testified that she saw Lillard open the back of the U-haul truck and that Nordstrom shopping bags were inside. Later, when she stopped Lillard, the back of the U-haul was padlocked.

Finally, the State offered substantial testimony and documentary evidence that Lillard disposed of the stolen property. Officer Poling testified that she observed a female with Lillard attempt to make a return. Rufer also testified that she observed the two females with Lillard attempting to make a return on the date Poling arrested him. She explained that Lillard "seemed to be overseeing the females who were conducting various return transactions." We hold that substantial evidence supports each alternate means of possessing stolen property.

 Lillard also raises a number of additional challenges to his conviction. Because these are without merit,

---

[26] *State v. Hickman*, 135 Wn.2d 97, 102, 954 P.2d 900 (1998) (in criminal cases the State assumes the burden of proving otherwise unnecessary elements of the offense when such added elements are included without objection in the "to convict" instruction); *State v. Rivas*, 97 Wn. App. 349, 351-52, 984 P.2d 432 (1999) (if one or more alternative means is not supported by substantial evidence, the verdict will stand only if the court can determine the verdict was based on only one alternative means and substantial evidence supports that alternative).

we reject them. He first argues that he was not given his constitutional rights as required by *Miranda*.[27] But the court specifically rejected this claim and found that Lillard had received proper *Miranda* warnings, and that he knowingly, intelligently, and voluntarily waived them. Given the officer's testimony, substantial evidence supports the court's findings.

Lillard claims that his speedy trial rights were violated because he was arraigned on August 10, and speedy trial expired on October 8. The trial did not begin until October 22. On October 3, the State informed the court it was ready to proceed to trial. The following day, the State asked the court to grant either a five-day continuance or an extension because one of its witnesses was unavailable to testify. The court granted the motion. Because the witness the State was relying on was material and unavailable due to a medical condition, the court's decision to grant the continuance was reasonable.

Lillard claims that his counsel ineffectively represented him by failing to sufficiently challenge probable cause at his CrR 3.6 hearing. We reject this argument because Lillard fails to show how this alleged error, if true, would lead to a different result.

Lillard claims that the trial court should have given the jury a missing witness instruction because one of the arresting officers did not testify at trial. But as Lillard admits, the trial court allowed Lillard to call the detective as a witness.

Lillard argues that the trial court violated his constitutional rights by admitting hearsay evidence from Nordstrom employees. He also argues that by allowing this testimony, the court compromised his right to confront witnesses.

He first claims that the trial court should not have admitted the videotapes because they were hearsay. But "hearsay" is "a statement, other than one made by the

[27] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[28] The Rules of Evidence define a "statement" as an "oral or written assertion or . . . nonverbal conduct of a person, if it is intended by the person as an assertion."[29] Out-of-court statements offered for a purpose other than the truth asserted do not qualify as hearsay and are not barred by the confrontation clause.[30]

██ Lillard also challenges the court's decision allowing testimony by Chadd Thomas concerning his investigation of the theft ring. Lillard objected when Thomas explained that he had called customers with the altered numbers to determine if they had used the cards. Lillard made a standing objection "to all the testimony related to what the alleged victim told [Thomas]." But contrary to Lillard's assertion, the State did not offer Thomas' statements to prove what the cardholders had said, but to show how he conducted his investigation. The evidence was not hearsay.

Lillard next challenges the sufficiency of the evidence. The State presented extensive evidence showing Lillard's participation in the criminal theft operation. This evidence showed that the merchandise was stolen, that Lillard knew it was stolen, and that Lillard possessed the stolen merchandise.

Lillard argues that the State did not disprove his defense that he appropriated the property under a good faith claim of title. But accepting the interviewing officer's testimony and all reasonable inferences from his testimony, this claim fails. The officer testified that when he asked Lillard about the scam, Lillard "said that he realized it [the crimes] was going on." And other evidence admitted at trial also supports the conclusion that Lillard knew that the items were fraudulently obtained. Videotape evidence showed Lillard

[28] ER 801(c).

[29] ER 801(a); *In re Dependency of Penelope B.*, 104 Wn.2d 643, 652, 709 P.2d 1185 (1985).

[30] *State v. Parris*, 98 Wn.2d 140, 145, 654 P.2d 77 (1982).

speaking with several persons using altered gift cards to purchase merchandise. In one instance, the purchaser is seen on video making repeated calls, apparently to Lillard. In another instance, Lillard appears to direct others as to the items they should procure. The inference is that Lillard directed these people in purchasing and returning the items, and that his actions confirm that he understood that he did not have a good faith claim to title.

Affirmed.

COLEMAN and AGID, JJ., concur.

Reconsideration denied August 26, 2004.

Review denied at 154 Wn.2d 1002 (2005).